IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **SHARON S. KIRKPATRICK,** ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| V. ) | Civil No. **06-838-DRH** |
| ) | |
| **MICHAEL ASTRUE**[1], ) | |
| **Commissioner of Social Security,** ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

Pursuant to 42 U.S.C. § 405(g), plaintiff Sharon S. Kirkpatrick, represented by counsel, is before the Court seeking review of the final decision of the Social Security Administration denying her Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423. **(Doc. 2).** In addition to submitting the administrative record **(Doc. 6 hereinafter referred to as "R.")**, plaintiff and defendant have fully briefed their positions. **(Docs. 14 and 16).** This Report and Recommendation is respectfully submitted to Chief United States District Judge David R. Herndon pursuant to 28 U.S.C. §§ 636(b)(1)(B) and (C).

### Synopsis of the Procedural History

On August 24, 2004, plaintiff Sharon S. Kirkpatrick applied for DIB, alleging the onset of disability as of October 1, 2003, due to degenerative disc disease, osteoporosis of the lumbar spine, post stroke, and cysts in her thumbs. **(R. 45 and 59).** The Social Security Administration ("SSA") denied plaintiff's application initially and on reconsideration. **(R. 21-31).**

Administrative Law Judge ("ALJ") M. Kathleen Gavin held a hearing on March 7, 2006,

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d)(1) and the last sentence of 42 U.S.C. § 405(g), Michael J. Astrue is, therefore, automatically substituted as the defendant in this civil action, and no further action is necessary to continue this case.

in Carbondale, Illinois, at which plaintiff appeared with counsel and testified.  **(R. 212-236).**  Vocational expert Dr. Darrell Taylor also appeared and testified at the hearing.  **(R. 212-236).**  In a decision dated June 26, 2006, the ALJ found that the plaintiff was not disabled and not entitled to DIB because she was capable of performing past relevant work as a seamstress, despite the limitations caused by her medical condition.  **(R. 10-18).**

The Appeals Council denied plaintiff's request for review on September 14, 2006, thereby making ALJ Gavin's decision the final decision of the Commissioner.  **(R. 4-9).**  Consequently, this matter is subject to review by the District Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## The General Scope of Review

The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 1382, et seq., and 20 C.F.R. pt. 404.  This Court reviews the decision denying plaintiff benefits to ensure that the ALJ's decision is supported by substantial evidence, and that no mistakes of law were made. *See* **42 U.S.C. § 405(g).**

As a preliminary matter, to be eligible for DIB, a claimant must be disabled during the time he was insured for benefits.  *See* **42 U.S.C. §§ 423(a)(1)(A), (c)(1); 20 C.F.R. § 404.131.**

To qualify for DIB a claimant must be "disabled."  "Disabled" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  **42 U.S.C. § 423(d)(1)(A).**  A "'physical or mental impairment' is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  **42 U.S.C. §§ 423(d)(3).**  "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit.  **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.  In essence, it must be determined (1) whether the claimant is presently employed; (2) whether the claimant has an impairment or combination of impairments that is severe; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **See Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992);** *see also* **20 C.F.R. §§ 404.1520(b-f).**

"The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ."  **42 U.S.C. § 405(g).**   Thus, the Court must determine not whether plaintiff is, in fact, disabled, but whether the ALJ's findings were supported by substantial evidence; and, of course, whether any errors of law were made.  **See Books v. Chater, 91 F.3d 972, 977-978 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995)).**  The Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  **Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427 (1971).**

In reviewing for "substantial evidence" the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  **Brewer v. Chater, 103 F.3d 1384, 1390 (7th Cir. 1997).**  Furthermore, an ALJ may not disregard evidence when there is no contradictory evidence.  **Sample v. Shalala, 999 F.2d 1138, 1143 (7th Cir. 1993).**

A negative answer at any point in the five step analytical process, other than at the third step, stops the inquiry and leads to a determination that the claimant is not disabled.  **Garfield v. Schweiker, 732 F.2d 605 (7th Cir. 1984).**  If a claimant has satisfied steps one and two, he or she will automatically be found disabled if he or she suffers from a listed impairment (step three).  If the claimant does not have a listed impairment but cannot perform his or her past work, the

burden shifts to the Secretary at step four to show that the claimant can perform some other job. ***Rhoderick v. Heckler***, 737 F.2d 714, 715 (7th Cir.1984).

## Issues Presented

Plaintiff Kirkpatrick contends ALJ Gavin's conclusions are not supported by substantial evidence. Specifically, plaintiff argues:

1. The ALJ failed to properly evaluate the plaintiff at step four of the sequential evaluation;

2. The ALJ failed to properly evaluate the plaintiff at step five of the sequential evaluation; and

3. The ALJ failed to evaluate the plaintiff's objective findings.

**(Doc. 14).**

The defendant Commissioner counters that ALJ Gavin weighed the evidence in the record and reasonably concluded that plaintiff could perform past relevant work as a seamstress despite the limitations caused by her impairments. Defendant argues that, as the ALJ observed, the record lacked clinical and diagnostic findings in support of plaintiff's physician's opinion that plaintiff had debilitating limitations. Consequently, defendant argues, it was unnecessary for the ALJ to reach step five of the sequential evaluation. Additionally, defendant argues that the ALJ's evaluation of plaintiff's objective findings was proper and that no authority mandates a referral for a consultative examination. **(Doc. 16).**

## Synopsis of Relevant Evidence

In April 1994, plaintiff was diagnosed with osteoporosis, a cyst in her right thumb, early basal joint (thumb) arthritis, and deQuervain's tendinitis bilaterally (right side greater than left). **(R. 201).** After over a month of occupational therapy aimed at treating these conditions, plaintiff reported significant relief of her symptoms. **(R. 201).**

On January 6, 2003, plaintiff saw her treating physician, Dr. Julia Bancroft, for back pain.

**(R. 188).** Dr. Bancroft prescribed Flexeril and Vicodin. **(R. 188).** Dr. Bancroft also ordered a bone density scan and lumbar x-rays. **(R. 188).** These tests were performed on January 9, 2003. **(R. 189).** The results suggested L4-S1 degenerative disc disease with an exaggerated lordotic curvature, osteoporosis in the lumbar vertebrae and osteopenia in bilateral hips. **(R. 187).** Dr. Bancroft instructed plaintiff to perform exercises to strengthen her trunk muscles so as to take weight off of the affected joints in her spine. **(R. 187).** Plaintiff continued to have back pain in May of 2003 and sought refills of her pain medication from Dr. Bancroft. **(R. 186).**

On September 29, 2003, plaintiff complained to Dr. Bancroft of pain in all of her joints, her fingers, hands and knees as well as her back. **(R. 185).** Plaintiff also told Dr. Bancroft that she was not sleeping well and that she was experiencing heart palpitations. **(R. 185).** Dr. Bancroft prescribed Vicodin and a Duragesic patch for the pain and gave plaintiff an order to get a heart event monitor. **(R. 185).** On October 9, 2003, plaintiff reported that the Duragesic patch reduced her need for other pain medication. **(R. 182).** From October 2 to November 6, 2003 the heart monitor recorded four events that appeared to indicate a rapid junctional rhythm. **(R. 183).**

Plaintiff underwent an MRI of her back on October 10, 2003, which revealed diffuse degenerative intervertebral disc space disease, changes from L2 through S1, and mild grade 1 anterolosthesis at L5-S1. **(R. 153).**

In December of 2003, plaintiff requested a higher dosage of Duragesic patch and told Dr. Bancroft that she was depressed due to the holidays. **(R. 181).** Dr. Bancroft increased the Duragesic patch dosage to 50 mcg/hour once every three days and prescribed plaintiff Wellbutrin for depression. **(R. 181).** However, on January 5, 2004, Dr. Bancroft decreased the Duragesic patch dosage to 25 mcg and replaced the Wellbutrin with Paxil because the Wellbutrin made plaintiff sick. **(R. 180).** She was also prescribed .25 mg of Xanax to take twice a day for anxiety. **(R. 180).** By April 22, 2004, plaintiff reported that she was taking her Vicodin sparingly and that her state of mind was good. **(R. 179).**

On April 29, 2004, plaintiff was admitted to the emergency room after tripping on her

5

shoe lace and falling in a rocky driveway.  **(R. 146 and 178).**  A CT scan revealed that she had sustained a fracture of the right zygomatic arch, a fracture of the posterior wall of the right maxillary sinus and a fracture involving the right orbital wall.  **(R. 150).**  The CT scan also revealed evidence of a previous stroke or similar event.  **(R. 149).**  X-rays of plaintiff's right shoulder did not reveal any fractures or dislocations resulting from the fall, but they did display degenerative arthritic changes involving the right shoulder acromioclavicular joint.  An MRI of her brain showed an old infarction or old inflammatory change involving the medial aspect of the right thalamus inferiorly but no associated edema or mass effect and no evidence of areas of acute infarction.  **(R. 145).**  An MR angiograph revealed no evidence of an aneurism.  **(R. 144).**  After these procedures were completed, Dr. Bancroft gave plaintiff a prescription for Plavix and advised her to take coated aspirin daily.  **(R. 178).**

On June 4, 2004, plaintiff was admitted to the emergency room for shingles.  **(R. 154).**  She was prescribed Valtrex and released.  **(R. 154).**

Plaintiff underwent an x-ray on June 22, 2004, which revealed mild atherosclerotic disease and no occlusion or stenosis.  **(R. 173).**  On a follow-up visit, Dr. Bancroft informed plaintiff that she may discontinue taking Plavix.  **(R. 172).**

On an August 13, 2004, visit with Dr. Bancroft plaintiff mentioned that "[s]he wants to apply for disability because she feels that she cannot hold a job and her husband's insurance is being canceled by the coal company."  **(R. 171)**.  Dr. Bancroft noted that plaintiff cannot sit or stand for periods of time and has been shown to have L5-S1 disc degeneration with exaggerated lordosis.  **(R. 171).**  Dr. Bancroft continued plaintiff on her pain medication and ordered an MRI of the lower lumbar and sacral area.  **(R. 171).**  The MRI revealed degenerative changes with posterior disc bulge L2-S1, most severe at L4-5 and L5-S1.  **(R. 171).**

Plaintiff filed for DIB on August 24, 2004.  **(R. 45-48).**  In September 2004, agency physician Dr. Rock reviewed plaintiff's claim.  **(R. 134-141).**  Dr. Rock determined that plaintiff could occasionally lift twenty pounds, frequently lift ten pounds, stand or walk about six hours in

an eight hour workday, sit for six hours in an eight hour work day, and she had an unlimited ability to push or pull.  **(R. 135).**  In January 2005, agency physician Dr. Jimenez Frank affirmed Dr. Rock's findings.  **(R. 133).**

In October of 2004, Dr. Deppe performed a psychological evaluation of the plaintiff at the request of the Bureau of Disability Determination Services.  **(R. 165).**  Dr. Deppe reported that all of plaintiff's mental abilities that are crucial to work-related activity were intact.  **(R. 167).**  Dr. Deppe also noted that plaintiff's hygiene, mood, communication skills, attention span, fund of general knowledge, memory, abstract reasoning skills, judgment, insight and ability to perform simple calculations were all normal.  **(R. 166-167).**  Although Dr. Deppe did not diagnose plaintiff with any mental impairment he did assign her a Global Assessment of Function ("GAF") score of 60-70, **(R. 168)**, which indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships."  **American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders – Fourth Edition – Text Revision (DSM-IV-TR)</u>, 34 (2000).**

In February 2006, plaintiff's treating physician, Dr. Bancroft, evaluated plaintiff's ability to do physical work-related activities.  **(R. 190).**  Dr. Bancroft stated that plaintiff was limited to lifting less than ten pounds, could stand for only two hours a day out of an eight hour workday, could sit less than six hours a day, albeit with a need to periodically alternate between sitting and standing, and that plaintiff was limited in pushing and pulling with her upper and lower extremities.  **(R. 190-191).**  As support for these conclusions, Dr. Bancroft relied on the MRI of plaintiff's back, and he cited plaintiff's deQervain's syndrome, osteoarthritis and need for braces when her condition flared.  **(R. 191).**

ALJ Kathleen Gavin held a hearing on March 7, 2006.  **(R. 212-236).**  Plaintiff testified that she had not been able to work since September of 2003 when she experienced the fall.  **(R. 220).**  She testified that she had been employed as a seamstress until July 2002, having stopped

working because the factory where she worked closed. **(R. 219).** Plaintiff testified that the pain in her back was excruciating; that it stays with her all day long; and that when she stands "it will cause like a hot fire to run down your leg" [sic]. **(R. 223).** When asked to rate the pain in her back on a level of one to ten, with ten being the most painful, plaintiff described her pain as a nine most of the time, even when she is taking medication. **(R. 224).** Plaintiff testified that, due to pain, she can only sit for about twenty minutes without having to move around. **(R. 223).** Plaintiff further testified that she had to wear braces on her hands periodically due to ganglion cysts from the deQuervain's in her thumbs. **(R. 218).** Plaintiff told the ALJ that she had arthritis in her back, hands, knees and hips. **(R. 222).** When questioned about her anxiety, plaintiff testified that she experiences anxious episodes three to four times a week, usually lasting about forty-five minutes each. **(R. 226).**

At this hearing Vocational Expert Dr. Taylor testified that plaintiff's previous occupation as a seamstress was, according to the <u>Dictionary of Occupational Titles</u>, a light position, skilled, with an SVP of 5. **(R. 229).** Dr. Taylor testified that a seamstress was considered a light occupation, as opposed to a sedentary one, because of the foot controls that are utilized and because there would be no skills that would be transferable to sedentary work. **(R. 229).**

## Analysis
### Step Four of the Sequential Evaluation

Plaintiff first argues that the ALJ failed to properly evaluate the plaintiff at step four of the sequential evaluation. **(Doc. 14 at 5).** Specifically, plaintiff asserts that "[t]he ALJ disregarded the Plaintiff's residual functioning capacity when assessing the Plaintiff's past work." *Id.*

At the fourth step of the sequential evaluation, the ALJ considers the assessment of a claimant's residual functioning capacity and the claimant's past relevant work. **20 C.F.R. § 404.1520(a)(4)(iv).** If the claimant can still perform past relevant work, the ALJ must find that

the claimant is not disabled. *Id.* Residual functioning capacity is defined as the most a claimant can do despite physical and/or mental limitations. **20 C.F.R. § 404.1545(a)(1).** Past relevant work is defined as work that a claimant has done within the past fifteen years that was substantial gainful activity and lasted long enough for the claimant to learn how to perform the work. **20 C.F.R. § 404.1560(b)(1).**

Plaintiff argues that the ALJ disregarded plaintiff's residual functioning capacity, but the ALJ clearly considered plaintiff's ability to perform past relevant work based on residual function capacity:

> In comparing the claimant's residual functioning capacity with the physical and mental demands of this work, the undersigned finds that the claimant is able to perform it as actually and generally performed. The claimant is capable of performing work at the light exertional level with only postural limitations. As the claimant's past work was at the light exertional level and did not require postural activities, nothing in her residual functioning capacity restricts her ability to perform her past relevant work.

**(R. at 17).** Plaintiff truly takes issue, not with the ALJ's comparison of residual functioning capacity with plaintiff's past relevant work, but rather with the ALJ's definition of plaintiff's residual functional capacity.

The ALJ found that plaintiff possessed the residual functional capacity to lift and carry ten pounds frequently and twenty pounds occasionally, sit at least six hours per eight hour day, and stand/walk six hours per eight hour day. **(R. at 15).** The ALJ further found that plaintiff can only occasionally climb, balance, stoop, kneel, crouch and crawl, but no other limitations were found. **(R. at 15).** In making these findings, the ALJ evaluated several types of evidence. First, the ALJ evaluated the objective medical evidence. The ALJ noted that the objective medical evidence presented by the plaintiff was very limited. **(R. at 15).** Specifically, the ALJ observed that, while plaintiff had been treated by her primary care physician, she had not been referred to an orthopedist, a neurosurgeon, or other specialist. **(R. at 15-16).** The ALJ further noted that there was no objective evidence documenting any loss of sensation, loss of muscle strength, abnormal reflexes, tenderness of palpitation, loss of range of motion, or other structural

abnormalities. **(R. at 16).** The ALJ concluded that this near-total lack of objective findings does not support the plaintiff's allegations of severe back pain and functional limitations. **(R. at 16).**

The ALJ also considered plaintiff's testimony concerning her alleged symptoms and the intensity, duration and limiting effects of these symptoms. **(R. at 15).** The ALJ found that, while plaintiff's medically determinable impairment could reasonably be expected to produce the alleged symptoms, plaintiff's statements describing the intensity, duration and limiting effects of these symptoms were not entirely credible. **(R. at 15).** In reviewing for "substantial evidence" the entire administrative record is taken into consideration, but this Court *does not* reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997).** From that perspective, the record supports the ALJ's conclusion that plaintiff's statements regarding the intensity, duration and limiting effects of her symptoms were not credible.

The ALJ also considered opinion medical evidence in determining plaintiff's residual functioning capacity. The ALJ considered medical opinion evidence from both Dr. Bancroft and the state agency medical reviewers. **(R. at 16-17).** The ALJ noted that in February 2006 Dr. Bancroft opined that plaintiff could lift no more than ten pounds, could stand for less than two hours per eight hour day and sit less than six hours per eight hour day, along with other limitations. **(R. at 16).** The ALJ then considered the opinions of the State agency medical reviewers that plaintiff could perform work at the light exertional level with an ability to perform all postural activities occasionally. **(R. at 16).** In deciding that Dr. Bancroft's opinion should be granted very little weight and that the state agency medical reviewers' opinions should be granted very great weight, the ALJ noted that Dr. Bancroft did not document any physical limitations and did not document any objective findings in her source opinion. **(R. at 16).**

Controlling weight must be given to the opinion of a treating physician *if*: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic technique"; and (2) the opinion is "not inconsistent with the other substantial evidence in the case record." ***See* 20**

**C.F.R. § 404.1527(d)(2); Social Security Ruling 96-2p, "Giving Controlling Weight to Treating Source Medical Opinions" (SSA 1996);** *see also Dixon v. Massanari,* **270 F.3d 1171, 1177 (7th Cir. 2001).** Dr. Bancroft's opinion satisfied neither of these requirements. Dr. Bancroft's opinion was not supported by acceptable diagnostic technique. Her opinion did not document any physical limitations and did not cite to any objective findings. Dr. Bancroft's opinion was inconsistent with both the opinion of the state agency medical reviewers and the lack specialized treatment. Thus, the ALJ's decision to grant great weight to state agency medical reviewers' opinions and little weight to Dr. Bancroft's opinion was supported by substantial evidence and was not an error of law.

Social Security Ruling 96-8p dictates that a residual functional capacity assessment include a narrative discussion describing how the evidence supports the ALJ's conclusion, citing specific medical facts. Here, the ALJ thoroughly detailed the evidentiary basis for the assessment of plaintiff's residual functioning capacity. **(R. at 15-17).** Ruling 96-8p also requires that medical source opinions must always be considered and addressed by the ALJ in the residual functioning capacity assessment, and if it conflicts with the ALJ's conclusions then the ALJ must explain why it was not adopted. In the instant case, the ALJ considered the medical source opinion of Dr. Bancroft and explained the decision to grant it little weight.

Overall, the ALJ's determination of plaintiff's residual functioning capacity was supported by substantial evidence; namely the lack of objective medical evidence, the lack of credible testimony from the plaintiff regarding key elements and the opinion testimony of the State agency medical reviewers. Furthermore, the ALJ's determination that nothing in plaintiff's residual functioning capacity prevents her from performing her past relevant work is also supported by substantial evidence. Plaintiff's past relevant work was as a seamstress. **(R. at 220).** At the hearing, the ALJ asked the vocational expert, Dr. Taylor, to give the exertional and skill level of the plaintiff's past relevant work as a seamstress. **(R. at 229).** Dr. Taylor testified that the position of seamstress according to the Dictionary of Occupational Titles, is a light

position, skilled, with an SVP of five. **(R. at 229).** Dr. Taylor further testified that the reason it is light, as opposed to sedentary, is due to the foot controls that are utilized and because the occupation did not require any skills transferable to sedentary work. **(R. at 229).** Since the ALJ found that plaintiff was capable of performing work at the light exertional level with only postural limitation, the finding that plaintiff was capable of performing her past relevant is clearly supported by substantial evidence. Therefore the ALJ properly evaluated plaintiff under step four of the sequential evaluation.

### Step Five of the Sequential Evaluation

Plaintiff next argues that the ALJ failed to properly evaluate plaintiff at step five of the sequential evaluation. **(Doc. 14 at 5-7)**. Specifically, plaintiff argues that the ALJ "failed to ask proper questions of the Vocational Expert ands [sic] took on the role of Vocational Expert as to determining that the Plaintiff could go back to work as a seamstress." **(Doc. 14 at 7).**

At step five of the sequential evaluation the ALJ considers the assessment of a claimant's residual functional capacity and your age, education, and work experience to see if the claimant can make an adjustment to other work. **20 C.F.R. § 404.1520(a)(4)(v).** If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled. **Id.** If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled. *Id.* However, if the ALJ can find that the claimant is not disabled at a step, the ALJ makes the determination or decision and does not go on to the next step. **20 C.F.R. § 404.1520(a)(4).** In other words, if the ALJ determines that a claimant is not disabled at step four of the sequential evaluation, the ALJ does not consider step five:

> If we find that you have the residual functional capacity to do your past relevant work, we will determine that you can still do your past work and are not disabled. We will not consider your vocational factors of age, education, and work experience or whether your past relevant work exists in significant numbers in the national economy.

**20 C.F.R. § 404.1560(b)(3).** Since, the ALJ found that the plaintiff was not disabled at step four of the sequential evaluation, the ALJ did not consider step five.

Furthermore, the ALJ is not required to pose a hypothetical to the vocational expert at step four of the sequential evaluation – that last step the ALJ considered in plaintiff's case. The ALJ may pose a hypothetical to the vocational expert at step four, but it is not a requirement. **20 C.F.R. § 404.1560(b)(2).** ("In addition, a vocational expert or specialist *may* offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy."(emphasis added)). Plaintiff fails to cite to any authority that would require the ALJ to pose a hypothetical question to the vocational expert at step four of the sequential evaluation. The cases cited by plaintiff, ***Wates v. Barnhart*, 274 F. Supp. 2d 1024 (E.D. Wis. 2003)** and ***Steele v. Barnhart*, 290 F.3d 936 (7th Cir. 2002)**, both address the proper means of posing a hypothetical to a vocational expert at step <u>five</u> of the sequential evaluation. The ALJ was neither required to address step five of the sequential evaluation nor pose a hypothetical question to the vocation expert at step four.

### Objective Findings

Finally, plaintiff argues that the ALJ failed to properly evaluate the "plaintiff's objective findings," meaning the objective evidence in the record. In so arguing, plaintiff essentially repeats the contention already addressed above that the ALJ should have granted more weight to the evidence supplied by Dr. Bancroft. **(Doc. 14 at 7-8).** Plaintiff does add to this argument the conclusory statement that "[t]he Plaintiff was never sent to a medical consultative examination by the Social Security Administration, which in the instant case would have been required." **(Doc. 14 at 8).**

13

;1;1A consultative examination is a physical or mental examination or test purchased for the claimant at the request and expense of the Administration from a treating source or another medical source. **20 C.F.R. § 1519.** The decision to purchase a consultative examination is made on an individual case basis. **Id.** Consultative examinations are not required. **20 C.F.R. § 1519a(b)** ("A consultative examination *may* be purchased when the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on your claim." (emphasis added)). Plaintiff fails to cite to any authority requiring a consultative exam. More to the point, this is clearly not a situation where the available evidence was insufficient to support the decision; rather, the objective evidence simply did not support the decision plaintiff hoped for. The ALJ's evaluation of plaintiff's objective findings was proper and supported by substantial evidence.

### Recommendation

For the aforestated reasons, the Commissioner's decision denying plaintiff Sharon S. Kirkpatrick's application for Disability Insurance Benefits or a Period of Disability should be affirmed in all respects, as the decision is supported by substantial evidence.

**SUBMITTED: November 21, 2007**

**s/ Clifford J. Proud**
**CLIFFORD J. PROUD**
**U. S. MAGISTRATE JUDGE**

### Notice of Response Deadline

In accordance with 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 6(e), the parties shall file any objections to this report and recommendation on or before **December 10, 2007**.